

# COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP

## COUNSELLORS AT LAW

PARK 80 WEST - PLAZA ONE, 250 PEHLE AVE., SUITE 401, SADDLE BROOK, NJ 07663
201-845-9600 •FAX 201-845-9423 •clphk@njlawfirm.com •www.njlawfirm.com

**Charles R. Cohen, ESQ. Email: crc@njlawfirm.com**

September 8, 2015

VIA ELECTRONIC CASE FILING
Hon. Madeline Cox Arleo, U.S.D.J.
U. S. District Court for the District of New Jersey
M.L. King Jr. Federal Building & Courthouse
50 Walnut Street, Room 2060
Newark, NJ 07102

>             Re:    LG Electronics U.S.A., Inc. v. ActionLink, LLC
>                    Case No. 2:15-CV-05472-MCA-MAH
>                    Our File: 39,181-0

Dear Judge Arleo:

This firm represents Defendant ActionLink, LLC ("ActionLink"). Currently pending before the Court is a motion to remand filed by Plaintiff LG Electronics U.S.A., Inc. ("LGEUS" or "Plaintiff"). (ECF No. 6.)

With the exception of Plaintiff's request for legal fees incurred in seeking remand, LGEUS's motion to remand is based upon the same factual assertions and legal arguments made in its June 12, 2015 motion to dismiss ActionLink's earlier-filed lawsuit for *forum non convenience*, also currently pending before this Court, entitled *ActionLink LLC v. LG Electronics U.S.A., Inc.*, Civil Action No. 2:15-cv-03168-MCA-MAH ( "Parallel Action"). (Parallel Action at ECF No. 17.)

ActionLink filed its opposition to LGEUS's motion to dismiss the Parallel action filed on July 6, 2015 (Parallel Action at ECF No. 26; copy attached hereto.) The basis for ActionLink's opposition to that motion is equally applicable to LGEUS's instant motion to remand. ActionLink therefore reiterates its arguments in opposition to LGEUS's motion to dismiss the Parallel action in opposition to LGEUS's motion to remand in the instant action.

**COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP**
COUNSELLORS AT LAW

Regarding LGEUS's demand for counsel fees, ActionLink wishes to point out that the decision on which LGEUS primarily relies is clearly distinguishable. *See* Stephens v. Gentilello, 853 F.Supp.2d 462 (D.N.J. 2012). In Stephens, Judge Rodriguez granted remand but declined to award counsel fees, despite the fact that the notice of removal at issue in that case was untimely and the matter had already been remanded to state court once before. *See* Id. at 471. The basis for removal of the present case is far more compelling, and mitigates against any fee award.

Thank you for your consideration.

Respectfully submitted,

/s/ Charles R. Cohen
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP

CRC:bb
cc:  All Counsel of Record (Via ECF)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

ACTIONLINK, LLC,

               Plaintiff,

vs.

LG ELECTRONICS U.S.A., INC.,

               Defendant.

Civil Action 2:15-cv-03168-MCA-MAH

Hon. Madeline Cox Arleo, U.S.D.J.
Hon. Michael A. Hammer, U.S.M.J.

RETURN DATE: JULY 20, 2015

---

**PLAINTIFF ACTIONLINK, LLC'S BRIEF IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S CLAIMS FOR *FORUM NON CONVENIENS***

---

**COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Charles R. Cohen, Esq.
Alex A. Pisarevsky, Esq.**
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
(201) 845-9600

*And Co-Counsel*

**WITSCHEY WITSCHEY & FIRESTINE
CO., LPA
Jeffrey T. Witschey, Esq.
Craig S. Horbus, Esq.**
405 Rothrock Road, Suite 103
Akron, Ohio 44321

*Attorneys for Plaintiff, ActionLink, LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT...........................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY
....................................................................................................................2

LEGAL ARGUMENT..................................................................................3

      DISMISSAL IS NOT APPROPRIATE BECAUSE THE FORUM SELECTION CLAUSE DRAFTED BY LG IS AMBIGUOUS AND MUST BE CONSTRUED AGAINST DEFENDANT AND IN FAVOR OF ACTIONLINK
....................................................................................................................3

CONCLUSION..........................................................................................8

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*Charles Cerlan, Inc. v. Woodbridge Ford, 197 N.J. Super. 104 (Law Div. 1984)*.............4

*CNA v. U.S.*, 535 F.3d. 132 (3d Cir. 2008)......................................................1

*Dixon v. TSE Intern., Inc.*, 330 F.3d 396 (5th Cir. 2003) ...........................................6

*Dura-Cast Products, Inc. v. Rotonics Mfg., Inc.*, No. 8:10–cv–1387–T–24 AEP, *2010 WL 3565725 (11th Cir. Sept. 10, 2010)*...........................................................7

*First State Bank of Northwest Arkansas v. Georgia 4-S Investment LLLP, 715 F.Supp.2d 1301 (N.D. GA 2010)*...................................................................4, 7

*Global Satellite Communication Co. v. Starmill U.K. Ltd., 378 F.3d 1269 (11th Cir. 2004)*..................................................................................4, 7

*Guinta v. Accenture, LLP*, Civ. No. 08-3376, 2008 WL 4852934 (D.N.J. Nov. 7, 2008) ......7

*Harvard Eye Associates v. Clinitec International, Inc.*, No. Civ. A. 98-302, 1998 WL 248916 (E.D. Pa. May 5, 1998)........................................................................5

*Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995).......................................4

*LFC Lessors, Inc. v. Pac. Sewer Maint. Corp.*, 739 F.2d 4 (1 Cir. 1984) ........................4

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995)............................7

*New Jersey v. Merrill Lynch & Co., Inc.*, 640 F.3d 545 (3d Cir. 2011)..........................5

*Newport Associates Development Co. v. Travelers Indem. Co. of Illinois*, 162 F.3d 789 (3d Cir. 1998)........................................................................6, 7

*Stateline Power Corp. v. Kremer*, 148 Fed. Appx. 770 (11th Cir. June 23, 2005) .............4

*U.S. ex rel Atkinson v. PA Shipbuilding Co.*, 473 F.3d 506 (3d Cir. 2007).....................1

## PRELIMINARY STATEMENT

Plaintiff, ActionLink, LLC ("ActionLink" or "Plaintiff") submits this brief and the accompanying Affidavit of Bruce Finn in opposition to defendant LG Electronics U.S.A., Inc.'s ("LG" or "Defendant") Motion to Dismiss Plaintiff's Claims for *Forum Non Conveniens* (Doc. No. 17). [1]

This is a breach of contract and business tort case. ActionLink seeks damages in contract due to LG's failure to perform under a Master Services Agreement (the "Agreement") and damages in tort caused by Defendant's wrongful business practices. (Doc. No. 1 at ¶¶ 12-33.) ("Compl."). ActionLink asserts six causes of action under New Jersey law arising out of Defendant's failure of performance under the Master Services Agreement and Defendant's tortious conduct. (*Id.* at ¶¶ 34-80.). [2]

The Motion to Dismiss asserts that New Jersey state court is the exclusive forum in which to resolve the parties' disputes based on a forum selection clause within the Agreement (the "Forum Selection Clause" or the "Clause"). (Mot. to Dismiss at p. 3-15.)

LG is wrong. The Forum Selection Clause cannot be enforced in the way Defendant suggests because the language is ambiguous: it may be interpreted to provide that proper venue lies in both federal court and New Jersey state court. Because LG, a much larger company than

---

[1] The Court may consider Mr. Finn's affidavit because Defendant's Motion to Dismiss is a factual attack on ActionLink's complaint based on its interpretation of the Forum Selection Clause, as opposed to a facial attack dealing with the sufficiency of the pleadings. *CNA v. U.S.*, 535 F.3d. 132, 145 (3d Cir. 2008) (where a party made a "factual attack on the existence of subject matter jurisdiction…" the District Court was "permitted to make factual findings, beyond the pleadings, that were decisive to determining jurisdiction) (citing *U.S. ex rel Atkinson v. PA Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007)).*

[2] This Court's jurisdiction over this case is based on diversity of citizenship. (Doc. No. 23, ¶¶ 3-9). *See* 28 U.S.C. 1332(a). Defendant has filed a separate motion to dismiss for lack of subject matter jurisdiction. (Doc. No. 16). ActionLink respectfully invites the Court's attention to Plaintiff's opposition to that motion, filed concurrently with this opposition, for a detailed discussion of the parties' citizenship at ECF #25.

1

ActionLink, drafted and unilaterally imposed the Agreement upon Plaintiff as a "take it or leave it" proposition, any ambiguity must be construed against Defendant. Therefore, this Court should deny LG's Motion to Dismiss.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On or about August 26, 2010, ActionLink entered into the Agreement with LG pursuant to which it was engaged and authorized by Defendant to design, implement and operate an in store execution brand program (the "Program"). (Compl. at ¶ 12). The aim of the Program was to improve sales of LG products. (*Id.*) Specific goals, details and requirements of the parties related to the Program were set forth in Statements of Work, dated December 1, 2010 and April 1, 2012 (the "SOWs"), both of which were incorporated into the Agreement. (Compl. at ¶ 13). LG unilaterally drafted both the Agreement and the SOWs. *See* June 30, 2015 Affidavit of Bruce Finn ("Finn Affidavit"), at ¶¶5, 6, filed herewith.

On May 5, 2015 ActionLink filed the present lawsuit alleging six causes of action stemming from the Agreement and the parties' relationship: Breach of Contract (Counts One and Two), Breach of Implied Covenant of Good Faith and Fair Dealing (Count Three), Tortious Interference with Business Relations and Contractual Relations (Counts Four and Five), and Misappropriation of Trade Secrets (Count Six). (Compl. at ¶ ¶ 34-80). On June 3, 2015 LG filed a state court action in the Superior Court of New Jersey, Law Division, Bergen County, alleging causes of action arising out of the same Agreement (the "State Court Action").

On June 12, 2015, Defendant filed a Motion to Dismiss ActionLink's Complaint on the basis of *Forum Non Conveniens*. On June 19, 2015, Plaintiff filed a letter with the Court invoking its right pursuant to Local Civil Rule 7.1(d)(5) to adjourn the instant motion, as well as Defendant's motion to dismiss for lack of subject matter jurisdiction, one cycle to July 20, 2015. (Doc. No. 21).

2

On July 2, 2015, Plaintiff filed a First Amended Complaint pursuant to Fed.R.Civ.P. 15(a)(1)(B). (Doc. No. 23).

LG claims that the Forum Selection Clause designates "New Jersey state courts" as the exclusive forum to resolve the parties' disputes related to the Agreement. (Motion to Dismiss at p. 3-15). However, this is not exactly what the Agreement says. Specifically, the Clause provides, in relevant part: "The parties agree to submit any dispute relating to this agreement to the exclusive jurisdiction of the courts of the State of New Jersey, United States of America." Apart from the ambiguity of the phrase "courts of the State of New Jersey," interpreting the Agreement as Defendant suggests would render superfluous the reference to the "United States of America." This lack of clarity, coupled with LG's superior bargaining power and the fact that Defendant unilaterally drafted the Agreement, warrants construing the Clause in the manner reasonably put forth by Plaintiff.

## LEGAL ARGUMENT

**Dismissal is not appropriate because the forum selection clause drafted by LG is ambiguous and must be construed against Defendant and in favor of ActionLink.**

Plainly read, the Forum Selection Clause fails to objectively convey which "courts" among the Federal District Court for the District of New Jersey and the Superior Court of New Jersey are included as "the courts of the State of New Jersey, United States of America". This ambiguity stems from the use of the term "of" and is compounded by the reference to another sovereign entity, the "United States of America" which is superfluous if only New Jersey's Superior Court is intended as venue. The most reasonable interpretation is that the reference to "United States of America" was to encompass federal court jurisdiction in the United States District Court for the

3

District of New Jersey in addition to state court jurisdiction before the New Jersey jurisdiction Superior Court.

"In federal court, the effect to be given a contractual forum selection clause in diversity cases is determined by federal not state law." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995). Several federal decisions have recognized that clauses using the phrase "the courts *of* [state]" are ambiguous even in the absence of a further complicating reference to the United States of America. *Stateline Power Corp. v. Kremer*, 148 Fed. Appx. 770, 771 (11th Cir. 2005) ("...the phrase "the courts of the State of Florida" is ambiguous, potentially including not only state courts but federal courts as well."); *First State Bank of Northwest Arkansas v. Georgia 4-S Investment LLLP*, 715 F.Supp.2d 1301, 1302 (N.D. GA 2010) ("...the Court concludes that the phrase 'courts of the State of Georgia' is ambiguous regarding whether it includes both state and federal courts."); *Global Satellite Communication Co. v. Starmill U.K. Ltd.*, 378 F.3d 1269, 1274 (11th Cir. 2004) ("...we find the phrase 'submit to the jurisdiction of Broward County, Florida,' to be vague and imprecise. It fails to specify what kind of jurisdiction it is referring to, whether it be in personam or territorial; and even if we were to assume it refers to jurisdiction exercised by a forum, because it names only a geographical unit, host to several forums, we can only guess which of these it intended to designate. The phrase is simply ambiguous, it lends itself to several possible reasonable interpretations..."); *LFC Lessors, Inc. v. Pac. Sewer Maint. Corp.*, 739 F.2d 4, 7 (1st Cir. 1984) (Based on *Black's Law Dictionary* (5th ed. 1979) (The Court concluded that "courts of the Commonwealth of Massachusetts" was ambiguous because it "could mean all the courts physically within the state or those courts that trace their origin to the state".)

Also, the Forum Selection Clause refers to courts in the plural and the Superior Court of New Jersey is a *single* unified Superior Court exercising original trial jurisdiction over all cases.

4

*Charles Cerlan, Inc. v. Woodbridge Ford*, 197 N.J. Super. 104, 106-109 (Law Div. 1984). (The singular Superior Court of New Jersey was established through an amendment to Article VI of the New Jersey Constitution in November 1983). Plainly read, "the courts of the State of New Jersey, United States of America" refers not only to *one, singular* Superior Court of New Jersey, but also the Federal District Court of the District of New Jersey (emphasis added). Further, because there is only one New Jersey state court and the Forum Selection Clause does not contain language that limits jurisdiction to "state courts", then a reasonable interpretation is that the use of the plural "courts" means the inclusion of the District Court for the District *of New Jersey*, as well. *See, Harvard Eye Associates v. Clinitec International, Inc.*, No. Civ. A. 98-302, 1998 WL 248916 (E.D. Pa 1998). (Holding that the forum selection clause included the District Court because it used the term "court" in the plural by saying: "courts of applicable jurisdiction."). Here the term "courts" is used in the plural and reasonably includes the Federal District Court.

While Defendant relies heavily on *New Jersey v. Merrill Lynch & Co., Inc.*, 640 F.3d 545 (3rd Cir. 2011) to argue the phrase "of the state of New Jersey" limits jurisdiction to state courts, the instant case is distinguishable from *Merrill Lynch* for two reasons.

First, there is a crucial difference between the language used in the Forum Selection Clause at issue and the clause in *Merrill Lynch*. The clause in *Merrill Lynch* stated: "exclusive jurisdiction ... shall lie in thein the appropriate courts of the State [of] New Jersey." (alterations in original) Unlike the Forum Selection Clause in *Merrill Lynch*, the clause at issue here adds an additional layer of ambiguity by referring to another sovereign entity, the "United States of America," which has its own courts. If the federal court of the United States was not an intended forum, the inclusion of this language would be unnecessary since both parties operate within the United States of America and are obviously aware that the state of New Jersey is located in the U.S.A. The addition

5

of "United States of America" thus leads to the inference that the United States District Court of the District of New Jersey was included as one of the "courts" which would serve as a permissible forum. The Forum Selection Clause thus includes the state court of New Jersey **and** the United States District Court.

In its Motion to Dismiss the Defendant has not pointed to any authority with language identical to the Forum Selection Clause. The closest analogue is from the Fifth Circuit. *Dixon v. TSE Intern., Inc.*, 330 F.3d 396 (5th Cir. 2003). In *Dixon*, the forum selection clause stated in relevant part: "The Courts of Texas, U.S.A. shall have jurisdiction …." *Id.* at 397. However, the term "Texas, U.S.A." was used in the same agreement immediately before the forum selection clause in a choice of law provision that made clear "Texas, U.S.A." meant just the State of Texas and not also the sovereign entity, U.S.A., such that a reasonable reader would know that the parties were referring to Texas alone, and not also the United States of America.[3] *Id.*

Second, and in sharp contrast to *Merrill Lynch*, the Forum Selection Clause in this case is part of a unilaterally prepared agreement, not a negotiated one. *See* Finn Affidavit, at ¶¶5, 6. Under these circumstances, the Forum Selection Clause's is ambiguous and should therefore be construed against the drafter, the Defendant. The Third Circuit has recognized that the doctrine of *contra preferentum* is relevant to these circumstances. This doctrine "states that 'as between two reasonable and practical constructions of an ambiguous contractual provision … the provision should be construed less favorably to that party which selected the contractual language.'"

---

[3] It did so by pointing out that the agreement "*** shall be governed by and in accordance with the laws of Texas, USA, as if it were made and wholly performed there; provided however, **that all questions concerning the construction and effect of PATENTS shall be governed by the laws of the *country* where the PATENT is issued**." (Capitalization original, emphasis and italics added). *Id.*

*Newport Associates Development Co. v. Travelers Indem. Co. of Illinois*, 162 F.3d 789, 794 (3d Cir. 1998) (quoting *United States v. Seckinger*, 397 U.S. 203, 216 (1970)). *Newport Associates* held that, in determining whether to construe ambiguities against the drafter of a contract, "[T]he dispositive question is not whether the insured is a sophisticated corporate entity, but rather whether the insurance contract is negotiated, jointly drafted or drafted by the insured." *Newport Associates Development Co*, 162 F.3d at 794. In this case, Defendant not only drafted the Agreement, but did so unilaterally. *See* Finn Affidavit.

Other decisions both within and outside the Third Circuit have expressed a similar view, whether based on *contra preferentum* or basic common law notions of fairness. *Guinta v. Accenture, LLP*, Civ. No. 08-3376, 2008 WL 4852934 at *9 (D.N.J. 2008) ("a court should construe ambiguous language against the interest of the party that drafted it") (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)); *Stateline Power Corp.*, 148 Fed. Appx. at 771 ("Plaintiff drafted the agreement; hence, the ambiguity must be resolved in favor of the defendant") (citing *Global Satellite Communication*, 378 F.3d at 1274 (11th Cir. 2004)); *Global Satellite Communication*, 378 F.3d at 1274 ("The phrase is simply ambiguous, it lends itself to several possible reasonable interpretations, and rather than strain to find that one should prevail over another, we must simply construe it against Global Satellite, the drafter."); *Dura-Cast Products, Inc. v. Rotonics Mfg., Inc.*, 2010 WL 3565725 at *2 (11th Cir. 2010) (The *Dura – Cast* Court sought to resolve the ambiguity in a forum selection clause by construing it against the drafter, but, because the clause was drafted jointly the court refused to engage the presumption against the drafter.); *First State Bank of Northwest* Arkansas, 715 F.Supp.2d at 1302 (Because the plaintiff drafted the agreement, the ambiguity must be resolved in the defendant's favor. The

Defendant interpreted the relevant clause to exclude federal courts, so the Court concluded that the phrase includes only the state courts.).

The Court should therefore deny Defendant's Motion to Dismiss Plaintiff's Claims for *Forum Non Conveniens* because the Forum Selection Clause is ambiguous as drafted and it should be construed against the Defendant to include the Federal District Court of New Jersey.

## CONCLUSION

For the foregoing reasons, ActionLink, LLC, respectfully asks the Court to deny Defendant's Motion to Dismiss Plaintiff's claims for *Forum Non Conveniens*.

\s\ **Charles R. Cohen**
**COHN LIFLAND PEARLMAN**
**HERRMANN & KNOPF LLP**
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
(201) 845-9600

*And Co-Counsel*

\s\ **Jeffrey T. Witschey**
**WITSCHEY WITSCHEY & FIRESTINE**
**CO., LPA**
405 Rothrock Road, Suite 103
Akron, Ohio 44321

*Attorneys for Plaintiff*

DATED: July 6, 2015

8

Case 2:15-cv-03168-MCA-MAH   Document 26-1   Filed 07/06/15   Page 1 of 1 PageID: 190

## AFFIDAVIT

STATE OF OHIO   )
                   )SS
SUMMIT COUNTY )

I, Bruce Finn, being first duly sworn, depose and state as follows:

1. I have personal knowledge of the facts set forth in this Affidavit.

2. I am a member of ActionLink, LLC ("ActionLink") and am familiar with the case and claims as alleged in ActionLink, LLC v. LG Electronics USA filed as Civil Action 2:15-cv-03168-MCA-MAH in the United States District Court District of New Jersey.

3. On or about August 26, 2010, ActionLink entered into a Master Services Agreement (the "Agreement") with LG Electronics USA whereby ActionLink was engaged and authorized by LG to design, implement and operate an in store execution brand program (the "Program"). The goal under the Program was to improve sales of LG products.

4. Specific goals, details and requirements of the parties related to the Program were set forth in Statements of Work, dated December 1, 2010 and dated April 1, 2012 (the "SOWs"). The Agreement and the SOWs are at issue in this matter. The SOWs were governed under the terms of the Agreement which ran until December 31, 2012.

5. The Master Services Agreement and SOWs executed by and between ActionLink and LG which are at issue in the litigation were drafted exclusively and entirely by LG Electronics USA and were not drafted by ActionLink.

6. ActionLink is a significantly smaller company than LG.

7. As such, ActionLink always believed and intended for the forum selection clause at issue to be inclusive of United States of America Federal District Courts to allow for a neutral forum to hear any disputes over the Agreement and/or SOWs.

AFFIANT FURTHER SAYETH NAUGHT.

Bruce Finn

SWORN TO AND SUBSCRIBED before me this 30th day of June, 2015

Notary Public

Marilyn K. Chapple, Notary Public
Residence.- Summit County
State Wide Jurisdiction, Ohio
My Commission Expires July 28, 2018

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ACTIONLINK, LLC,<br><br>                              Plaintiff,<br><br>vs.<br><br>LG ELECTRONICS U.S.A., INC.,<br><br>                              Defendant. | Civil Action 2:15-cv-03168-MCA-MAH |

## CERTIFICATION OF CHARLES R. COHEN

CHARLES R. COHEN, being duly sworn, declares under the penalties of perjury as follows:

1.       I am a member of the law firm of Cohn Lifland Pearlman Herrmann & Knopf LLP, co-counsel for plaintiff ActionLink, LLC in the above-captioned matter. I am admitted to practice in the State of New Jersey and before this Court.

2.       I submit this certification in opposition to defendant LG Electronics U.S.A., Inc.'s Motion to Dismiss Plaintiff's Claims for *Forum Non Conveniens* and specifically to provide the Court with the unpublished opinions referenced in Plaintiff's memorandum of law.

3.       The unpublished opinion *Dura-Cast Products, Inc. v. Rotonics Mfg., Inc.*, No. 8:10–cv–1387–T–24 AEP, 2010 WL 3565725 (11th Cir. Sept. 10, 2010) is attached hereto as **Exhibit "A"**.

Case 2:15-cv-03168-MCA-MAH   Document 26-2   Filed 07/06/15   Page 2 of 21 PageID: 192

4.      The unpublished opinion *Guinta v. Accenture, LLP*, Civ. No. 08-3376, 2008 WL 4852934 (D.N.J. Nov. 7, 2008) is attached hereto as **Exhibit "B"**.

5.      The unpublished opinion *Harvard Eye Associates v. Clinitec International, Inc., No. Civ. A. 98-302, 1998 WL 248916 (E.D. Pa. May 5, 1998)* is attached hereto as **Exhibit "C"**.

6.      The unpublished opinion *Stateline Power Corp. v. Kremer*, 148 Fed. Appx. 770 (11th Cir. Jun. 23, 2005) is attached hereto as **Exhibit "D"**.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on the 7th day of July, 2015.

/s Charles R. Cohen
CHARLES R. COHEN

# EXHIBIT "A"

**Dura-Cast Products, Inc. v. Rotonics Mfg., Inc., Not Reported in F.Supp.2d (2010)**

2010 WL 3565725

---

2010 WL 3565725
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court, M.D. Florida,
Tampa Division.

DURA–CAST PRODUCTS, INC., Plaintiff,
v.
ROTONICS MANUFACTURING, INC.
and Sherman McKinniss, Defendants.

No. 8:10–cv–1387–T–24 AEP.    |    Sept. 10, 2010.

**Attorneys and Law Firms**

Brian J. Knowles, Straughn & Turner, PA, Winter Haven, FL,
for Plaintiff.

David C. Schwartz, Michele G. Johnson, Banker Lopez
Gassler, PA, Orlando, FL, for Defendants.

*ORDER*

SUSAN C. BUCKLEW, District Judge.

*\*1* This cause comes before the Court on Defendant
Rotonics Manufacturing, Inc.'s ("Rotonics") Motion to Stay
Remand Order. (Doc. No. 24). Plaintiff opposes the motion.
(Doc. No. 27).

*I. Background*

Plaintiff filed suit against Rotonics in state court, asserting
fraud and contract claims. Rotonics removed the case to this
Court based on diversity jurisdiction, and Plaintiff filed a
motion to remand based on a forum selection clause ("FSC")
in the parties' contract. The FSC provided that "[t]he courts of
the state of Florida shall have sole and exclusive jurisdiction
of all disputes arising with respect to this Agreement or any
other matter among the parties hereto."(Doc. No. 2, Ex. A, ¶
17.0). The parties dispute whether the FSC designates Florida
state courts or all courts located in Florida as the exclusive
forum for their litigation.

On August 5, 2010, this Court concluded that the FSC
designates Florida state courts as the exclusive forum for

the parties' litigation after making the following findings:
(1) the FSC is mandatory, because it designates the sole
and exclusive forum for the litigation between the parties
—"courts of the state of Florida;" (2) the description of the
designated forum is ambiguous, because it is unclear whether
the designated forum is Florida state courts or all courts
located in Florida; (3) the FSC was jointly drafted; (4) there
was no indication regarding the parties' intended meaning of
the ambiguous phrase "courts of the state of Florida;" and
(5) other courts that have considered similar language have
concluded that when an FSC identifies the designated forum
as courts "of" a specific state, the designated forum is state
court (and not all courts located within the state). (Doc. No.
23). As such, this Court granted Plaintiff's motion to remand,
and the Clerk remanded the case.

On August 17, 2010, Defendant filed the instant motion to
stay the remand order pending appeal. On August 20, 2010,
Rotonics filed its Notice of Appeal of this Court's remand
order.

*II. Motion to Stay*

In order to obtain a stay pending appeal, the movant must
show four things: (1) a likelihood of success on the merits
of the appeal; (2) irreparable injury if the stay is not granted;
(3) no substantial harm to other interested persons; and (4)
no harm to the public interest. *See U.S. v. 2 Parcels of
Real Property Consisting of 30 Acres*, 2010 WL 2836596,
at \*1 (S.D.Ala.2010) (citations omitted). The first factor
—likelihood of success on the merits of the appeal—is
ordinarily the most important factor in the analysis, and as
such, the movant must show, at a minimum, a substantial case
the merits. *See id.* at \*2.

Rotonics contends that it will likely succeed on its appeal.
In support of this contention, Rotonics sets forth three
reasons why it believes that this Court's remand order
will likely be reversed on appeal: (1) the remand order is
inconsistent with case law within the Eleventh Circuit; (2)
this Court erroneously considered non-Florida case law when
interpreting the ambiguous language in the FSC; and (3)
this Court failed to address the issue of whether Rotonics
agreed in the FSC to waive its right to remove. However,
as explained below, the Court rejects these arguments and
finds that Rotonics has not shown that it will likely prevail
on appeal.

*A. Case Law Within the Eleventh Circuit*

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.                1

**Dura-Cast Products, Inc. v. Rotonics Mfg., Inc., Not Reported in F.Supp.2d (2010)**

2010 WL 3565725

**\*2** Rotonics argues that this Court's remand order is inconsistent with case law within the Eleventh Circuit. The Court, however, believes that Rotonics misconstrues the case law that it relies on and misunderstands the difference between a permissive FSC and an ambiguous FSC.

There are two types of FSCs—permissive and mandatory. *See Global Satellite Communication Co. v. Starmill U.K. Limited,* 378 F.3d 1269, 1272 (11th Cir.2004). A mandatory FSC designates the exclusive forum for future litigation between the parties. *See id* .(citation omitted). A permissive FSC designates a particular forum where the parties agree future litigation may be brought, but it does not prevent the parties from initiating future litigation in a different forum. *See id.*

If the FSC simply states that the parties "consent" to jurisdiction in a particular forum, or if it states that the parties agree that litigation "may" be brought in a particular forum, the FSC is permissive. The parties must do more than merely consent to jurisdiction in a particular forum in order for the FSC to be interpreted as mandatory; instead, the parties must use language that clearly expresses the exclusivity of the designated forum. [1]

Rotonics correctly argues that the FSC in the instant case contains ambiguous language, as the Eleventh Circuit has concluded that the phrase "the courts of the State of Florida" is ambiguous. *See Stateline Power Corp. v. Kremer,* 148 Fed. Appx. 770, 771 (11th Cir.2005). However, Rotonics appears to confuse FSCs that contain ambiguous language with permissive FSCs, arguing that if an FSC contains ambiguous language, then the FSC is deemed to be permissive. While there are cases where the FSC contains ambiguous language *regarding the exclusivity of the designated forum* and the courts have found the FSC to be permissive, the courts have done so because *they construed the ambiguous language regarding exclusivity against the drafter. See, e.g, Citro Florida, Inc. v. Citrovale, S.A.,* 760 F.2d 1231, 1232 (11th Cir.1985)(finding the FSC to be permissive after concluding that the phrase "the place of jurisdiction is Sao Paulo/Brazil" was ambiguous regarding whether Brazil was the exclusive forum, and then interpreting the ambiguity regarding exclusivity against the drafter of the FSC). However, Rotonics' reliance on cases that analyze FSCs that contain ambiguous language regarding the exclusivity of the designated forum is misplaced, because (1) the FSC in the instant case was jointly drafted (and thus, it is not possible to construe the ambiguous language against the drafter), and (2) the ambiguous language in the FSC

relates to the *identification* of the designated forum (not to the *exclusivity* of the designated forum).

Similarly, Rotonics' reliance on *Stateline Power* and *Global Satellite* is misplaced. While both *Stateline Power* and *Global Satellite* involved FSCs with an ambiguity regarding the identification of the designated forum (as does the instant case), the courts in *Stateline Power* and *Global Satellite* resolved the ambiguity by construing the ambiguity against the drafting party. *See Stateline Power,* 148 Fed. Appx. at 771; *Global Satellite,* 378 F.3d at 1274. Since the FSC was jointly drafted in the instant case, neither *Stateline Power* nor *Global Satellite* help this Court to interpret the ambiguous language in the parties' FSC.

### B. Non–Florida Case Law

**\*3** The contract containing the FSC in the instant case provides that the contract shall be "construed in accordance with the laws of the State of Florida."(Doc. No. 2, Ex. A, ¶ 17.0). However, neither party has directed this Court to relevant Florida case law regarding how to interpret a jointly drafted, mandatory FSC when the FSC contains ambiguous language regarding the identification of the designated forum. Therefore, this Court was left to make an educated guess regarding how to construe the ambiguous FSC in accordance with Florida case law. In attempting to reach the correct interpretation of the ambiguous language, this Court considered how other courts have analyzed similar ambiguous language in FSCs (since this Court believes that Florida courts would consider how other courts have ruled if faced with this issue). Since the overwhelming case law outside of Florida construed similar ambiguous language in an FSC as designating state courts (as opposed to both state and federal courts located within the state), this Court reasoned that Florida courts would decide the issue the same way.

### C. Waiver of Right to Remove

Rotonics argues that in the remand order, this Court failed to address the issue of whether Rotonics agreed in the FSC to waive its right to remove the case to federal court. However, the Court construed the parties' mandatory FSC as providing that Florida state courts were the sole and exclusive forum for the parties' litigation. Since the parties designated Florida state courts as the sole and exclusive forum, Rotonics' waiver of its right to remove the case to federal court is implied by the mandatory language in the FSC.

**Dura-Cast Products, Inc. v. Rotonics Mfg., Inc., Not Reported in F.Supp.2d (2010)**

2010 WL 3565725

### III. Conclusion

As explained above, neither party has directed this Court to relevant Florida case law regarding how to interpret a jointly drafted, mandatory FSC when the FSC contains ambiguous language regarding the identification of the designated forum. Given the lack of relevant case law on the issue, Rotonics cannot show that it is likely to prevail on appeal. Furthermore, the Court finds that Rotonics has not shown that it will be irreparably harmed if the stay is not granted. As such, the Court finds that a stay of the remand order pending appeal is not warranted.

Accordingly, it is ORDERED AND ADJUDGED that Rotonics' Motion to Stay Remand Order (Doc. No. 24) is **DENIED.**

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3565725

Footnotes

1    Generally, permissive FSCs arise in two situations: (1) the language used in the FSC fails to indicate exclusivity of the designated forum, or (2) the language used in the FSC is ambiguous regarding the exclusivity of the designated forum, the non-drafting party argues that the FSC is permissive (*i.e.*, that the designated forum is not the exclusive forum for litigation), and the court construes the ambiguous language regarding exclusivity against the drafter.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "B"

**Guinta v. Accenture, LLP, Not Reported in F.Supp.2d (2008)**

2008 WL 4852934

---

2008 WL 4852934
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

Marco GUINTA, Plaintiff,
v.
ACCENTURE, LLP, Defendant.

Civ. No. 08-3376 (DRD).    |    Nov. 7, 2008.

West KeySummary

**1**    **Labor and Employment**
    ⇨ Severance Plans

An employer's motion for summary judgment in regards to an employee's claim for wrongfully withholding separation benefits was granted. The employer's separation policy required that an employee agree to and sign a separation agreement to receive the agreed to separation benefits. Upon the employee being terminated from his job he refused to sign the employer's separation agreement. As a result, the employee was not entitled to separation benefits.

Cases that cite this headnote

**Attorneys and Law Firms**

Sokol, Behot and Fiorenzo, by: Susan Burns, Esq., Hackensack, NJ, for Plaintiff.

Wong Fleming, P.C., by: Linda Wong, Esq., Princeton, NJ, for Defendant.

*OPINION*

DEBEVOISE, Senior District Judge.

**\*1** Plaintiff Marco Guinta is a former employee of Defendant Accenture, LLP ("Accenture"). Following the termination of his employment on March 12, 2008, Mr. Guinta filed identical complaints in the Superior Courts

of New Jersey for Bergen and Morris Counties alleging that his firing violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1, et. seq. In addition to the discrimination claims, the Complaint seeks payment of various benefits allegedly withheld by Accenture. Accenture removed on the grounds this court has jurisdiction pursuant to 28 U.S.C. § 1331. In the alternative, Accenture argues that this court properly has jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332.

Accenture now moves to dismiss Counts Three through Seven of Mr. Guinta's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, that motion will be treated as a request for summary judgment, granted in part, and denied in part.

**I. BACKGROUND**

Mr. Guinta has a shattered voicebox which affects his ability to speak. That disability does not appear to have limited Mr. Guinta's capacity to perform his duties at Accenture, where he was employed from June 17, 2002 until his termination on March 12, 2008. Indeed, Mr. Guinta's employee evaluations consistently rated his performance as "above average." (Compl.¶ 10.) Accenture acknowledges that Mr. Guinta was not fired due to misconduct or poor work performance, but rather as part of a routine "position elimination." (Def.'s Br. Supp. Mot. Dismiss. 3.)

At the time of his termination, Mr. Guinta's base compensation was $230,000 per year. In addition to his salary, Mr. Guinta was eligible for Paid Time Off ("PTO") and performance-based bonuses. Mr. Guinta's 2007 and 2008 Compensation Models provided that he would receive an "annual incentive" cash bonus and "long term incentive" equity bonus, each equal to his base pay, if he met his yearly target of $40 million in sales. (Compl., Ex. A, B.) The terms of the latter bonus provided that it would be paid at the completion of the fiscal year in the form of equity, but did not specify the form of stock which would be awarded or provide a vesting schedule for the securities. (Compl., Ex. A, B.)

Mr. Guinta's Complaint, which was filed in the Superior Court of New Jersey on June 26, 2008 and subsequently removed to this court, contains seven Counts. The first two claim, respectively, that Accenture terminated Mr. Guinta

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    1

**Guinta v. Accenture, LLP, Not Reported in F.Supp.2d (2008)**

2008 WL 4852934

in violation of the NJLAD and the ADA. Those allegations are not at issue in the motion currently before the court, which contends that Counts Three through Seven should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Counts Three through Seven allege that Accenture wrongfully refused to pay Mr. Guinta various benefits after his termination on March 12, 2008. Specifically, Mr Guinta claims that his 2007 and 2008 Compensation Models, along with the terms of Accenture's Separation Benefits Plan, entitle him to (1) separation benefits of 13 weeks pay plus four months of COBRA payments, (2) payment for 340 hours of PTO, (3) a 2007 long term incentive equity bonus of $230,000 in Accenture stock, and (4) both cash and equity bonuses for the period between the end of the 2007 fiscal year and the termination of his employment. In response, Accenture argues that (1) Mr. Guinta's refusal to execute a Separation Agreement made him ineligible for severance pay, (2) the company's PTO policy clearly specified that only 240 hours would be paid out after an employee's dismissal, (3) Mr. Guinta's 2007 long term incentive equity bonus had not vested at the time of his termination, and (4) Mr. Guinta's claim for cash and equity bonuses accrued between the end of 2007 and his termination is speculative and Mr. Guinta was not entitled to any bonuses for the 2008 year. In support of their arguments, the parties point to various contracts and employment documents.

*2 Both parties agree that the terms of Accenture's Separation Benefits Plan ("the Plan") govern Count Three's claim for severance payments. The Plan's summary, which is relied on by both parties as a statement of the relevant terms, provides that:

> If your employment with Accenture is terminated as part of a Workforce Reduction or Position Elimination, you submit a signed Separation Agreement to Accenture by the specified deadline (and, if applicable, do not revoke the Agreement), and you satisfy all the other conditions of the Plan, you will be entitled to Separation Benefits. [1]

(Compl.Ex. C.)
In a section entitled "Separation Agreement," the Plan makes it clear that "[a] Participant whose employment is terminated for Workforce Reduction or Position Elimination is eligible for Separation Benefits only if the Participant signs and submits to Accenture a Separation Agreement in the written form provided and approved

by Accenture."(*Id.* (emphasis in original).) Finally, the Plan specifies that it is "governed and shall be construed in accordance with ERISA," the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, enumerates the various rights granted to employees under that law, and names Accenture as the fiduciary responsible for Plan administration. (*Id.*)

The Separation Agreement required by the Plan states that "Accenture is offering you the opportunity to receive Separation Benefits in exchange for signing a general release of claims."(Def.'s Br. Supp. Mot. Dismiss, Ex. A.) That release is extremely broad, and includes "any and all claims of any nature whatsoever, known or unknown," such as "[c]laims for the payment of any salary, wages, bonuses and commissions," and "[c]laims of discrimination under the common law or any federal or state statute (including ... the Americans with Disabilities Act)."(*Id.*)Mr. Guinta did not execute the Separation Agreement. (Pl.'s Br. Opp'n Mot. Dismiss 17.); (Def.'s Br. Supp. Mot. Dismiss 6.)

Accenture introduces two documents in support of its argument that Count Four should be dismissed. The first, entitled "United States Policy: Paid Time Off," states that "unused PTO balances (up to 240 hours) will be paid out upon separation from the Company or prior to going on an approved unpaid leave of absence. Any unused accrued balance in excess of 240 hours will not paid out, except where required by local law."(Def.'s Br. Supp. Mot. Dismiss, Ex. D.) The second document is a list of "Separation Package Frequently Asked Questions for Employees," which reiterates that "PTO will be paid out only up to 240 hours, except in states where law requires otherwise."(Def.'s Br. Supp. Mot. Dismiss, Ex. C.)

In support of the claim contained in Count Five, that Accenture wrongfully refused to pay his equity bonus for 2007, Mr. Guinta refers the court to his 2007 Compensation Model. That document states Mr. Guinta's yearly sales "target" for 2007 as $40 million, and Accenture concedes that Mr. Guinta met his sales target for the 2007 fiscal year. (Def.'s Br. Supp. Mot. Dismiss 2.) In reference to the equity bonus, the Compensation Model provides that "you will ... be eligible for a Long Term Incentive award program aligned to your target-this award is paid at the completion of the fiscal year in the form of equity."(Compl., Ex. A.) The Compensation Model also states that "the Long Term Incentive Award percentages for FY07 at the various performance levels are as follows: ... Target-100% of your base pay as a bonus payable in equity," thus fixing the value of Mr. Guinta's 2007 equity

**Guinta v. Accenture, LLP, Not Reported in F.Supp.2d (2008)**

2008 WL 4852934

bonus at $230,000. (*Id.*) Finally, the Model provides that its terms are the sole authority governing compensation by stating that:

> **\*3** This model supersedes any type of other variable pay program or equity program in which you may currently be participating ... As a result, you will not be eligible for any other type of company wide or local variable pay programs or equity programs. Please be advised that Accenture reserves the right to amend, modify, or withdraw this model at any time, with or without notice.

(Compl., Ex. A.)

Mr. Guinta agreed to the 2007 Compensation Model on August 20th of that year. Neither party contends that the 2007 Compensation Model was modified or abrogated prior to its expiration.

Accenture contends that the equity award provided for by the Compensation Model was subject to the terms of a separate document, the "Form of Employee Restricted Share Unit Agreement (Fiscal 2008)" ("RSU Agreement"). That Agreement incorporates by reference two others: the "Accenture Ltd.2001 Share Incentive Plan" ("SIP") and the "Senior Manager Restricted Share Unit Agreement Essential Grant Terms" ("Essential Grant Terms"). Thus, Accenture claims that Mr. Guinta's equity bonus was subject to the terms and conditions of all three documents.

The RSU Agreement, which defines an RSU as "the unfunded, unsecured right of the Participant to receive a Share on the date(s) specified herein, subject to the conditions specified herein," includes a heading titled "Vesting Schedule." (Def.'s Br. Supp. Mot. Dismiss, Ex. G.) The schedule states that:

> Subject to the Participant's continued employment with the Company ... the RSUs shall vest pursuant to the vesting schedule set forth in the Essential Grant Terms (as modified by this Agreement), until such RSUs are 100% vested. Upon the Participant's termination of employment for any reason, any unvested RSUs shall immediately terminate, and no other shares shall be issued.

(*Id.*)

The Agreement also contains a section under which the Participant acknowledges that:

> Participant's participation in the Plan is outside the terms of the Participant's contract of employment with the Constituent Companies and is therefore not to be considered part of any normal or expected compensation and that the termination of the Participant's employment under any circumstances whatsoever will give the Participant no claim or right of action against the Company or its Affiliates in respect of any loss of rights under this Agreement or the Plan.

(*Id.*)

Finally, the RSU Agreement states that its "interpretation, performance and enforcement" shall be "governed by the laws of the State of New York ... and shall be subject to the exclusive jurisdiction of the New York Courts."(*Id.*)

The SIP contains information on the pricing and administration for stock option and RSU grants on the part of Accenture. (Def.'s Br. Supp. Mot. Dismiss, Ex. H.) The details of those terms are largely irrelevant for the purposes of this ruling, except inasmuch as the SIP provides that "[t]he Plan shall be governed by and construed in accordance with the laws of the State of New York."(*Id.*)

**\*4** The Essential Grant Terms lay out the specifics of the vesting schedule provided for in the RSU Agreement. That document provides that the shares awarded under the RSU Agreement will vest over a period of three years, with one third vesting each year. (Def.'s Br. Supp. Mot. Dismiss, Ex. J.) Thus, Accenture claims that under the RSU Agreement and Essential Grant Terms, none of the shares awarded at the end of 2007 as part of Mr. Guinta's equity bonus for that year could have vested by the time he was terminated roughly three months later on March 12, 2008. Since the RSU Agreement provides that unvested shares are forfeited in the event of termination, Accenture argues that Mr. Guinta is barred from asserting the claim for those shares contained in Count Five of the Complaint.

## II. DISCUSSION

As a preliminary matter, it is necessary to address the nature of the motion currently before the court. In support of its contention that Counts Three through Seven of Mr. Guinta's Complaint do not state a claim upon which relief can be granted, Accenture introduces various documents that allegedly preclude those claims. The inclusion of those

**Guinta v. Accenture, LLP, Not Reported in F.Supp.2d (2008)**

2008 WL 4852934

documents, many of which were not part of the pleadings and were not relied upon by the Complaint, requires this court to treat Accenture's motion as a request for summary judgment. Fed.R.Civ.P. 12(d).

Accenture rightly points out that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss" without converting the motion to one for summary judgment. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). However, the court may only do so "if the plaintiff's claims are based on the document."*Id.*

Accenture seeks to introduce three documents that were not relied upon by the Complaint. While Accenture's argument with regard to Count Three is based on the terms of the Separation Benefits Plan, a document that was cited in the Complaint and attached thereto, the company refers to documents outside the pleadings in support of its contention that Counts Four through Seven should be dismissed. Specifically, Accenture alleges that the company's PTO Policy (Def.'s Br. Supp. Mot. Dismiss, Ex. D) is dispositive as to Count Four of the Complaint, and that the RSU Agreement (Def.'s Br. Supp. Summ. J. Ex. G) and RSU Agreement Essential Grant Terms (Def.'s Br. Supp. Mot. Dismiss, Ex. J) require dismissal of Counts Five through Seven. Mr. Guinta does not dispute the authenticity of the documents that accompany Accenture's motion, but argues as a matter of law that he is not bound by their terms.

Since the documents Accenture seeks to introduce are outside the scope of the pleadings and did not form the basis of Mr. Guinta's claims, the motion to dismiss will be converted to a motion for summary judgment. *See*Fed.R.Civ.P. 12(d); *Pension Benefit Guar. Corp.,* 998 F.2d at 1196. When converting a motion to dismiss to one for summary judgment, a court must normally give the litigants 10 days notice to oppose the motion pursuant to the requirements Federal Rule of Civil Procedure 56(c).*Pension Benefit Guar. Corp.,* 998 F.2d at 1196. The purpose of that notice is to allow the parties time to "research and present the law, as well as an opportunity to marshal the facts."*Hancock Indus. v. Schaeffer,* 811 F.2d 225, 229 n. 1 (3d Cir.1987).

\*5 On September 30, 2008, the court informed both parties that the motion would be treated as a request for summary judgment. In order to give the parties a fair opportunity to file arguments based on the standard of review applicable to such requests, the court adjourned for four weeks. During that time,

Mr. Guinta submitted a brief in opposition to Accenture's original motion, and Accenture filed reply brief in support of summary judgment.

**A. Summary Judgment Standard of Review**

Summary judgment is proper where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."*Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir.2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."*Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary. *Id.* at 324.In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. *Id.* at 251-52.

**B. Count Three: Severance Pay**

Count Three of the Complaint alleges that Accenture wrongfully withheld separation benefits to which Mr. Guinta was entitled as a result of his termination. Accenture counters that those benefits were contingent on Mr. Guinta's agreement

**Guinta v. Accenture, LLP, Not Reported in F.Supp.2d (2008)**

2008 WL 4852934

to waive future claims against the company. Because Mr. Guinta did not agree to waive those claims, Accenture contends that it was under no obligation to pay severance benefits.

*6 It is well-established that an employee is not automatically entitled to severance benefits in the absence of an employer policy or contract providing for such payments. *See, e.g. Local Union No.1992 of the Int'l Bhd. Of Elec. Workers v. The Okonite Co.,* 189 F.3d 339, 340 (3d Cir.1999) (stating that employees' claim for entitlement to severance benefits arose out of collective bargaining agreement); *Deibler v. United Food and Commercial Local Workers' Union 23,* 973 F.2d 206, 210 (3d Cir.1992) (stating that the plaintiff in that case had "no right to severance benefits" because the severance pay plan at issue was revoked prior to his termination). As a condition of receiving severance benefits, an employee may be required by the relevant policy or contract to waive claims against his or her employer that arose prior to termination. *See Local Union No.1992,* 189 F.3d 339 at 344-45 (reversing district court's holding that severance benefits agreement did not require former employees of an electrical component manufacturer to waive all claims, and remanding for determination of whether the terms of the agreement required such a release); *Mullen v. N.J. Steel Corp.,* 733 F.Supp. 1534, 1543-44 (D.N.J.1990) (holding that plaintiff's knowing and voluntary release of "all claims past and present" in exchange for severance benefits was an effective waiver of a cause of action arising under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et. seq.*). In cases where such a waiver is required, an employee's refusal to sign the release agreement will render that employee ineligible for severance benefits. *Hooven v. Exxon Mobil Corp.,* 465 F.3d 566, 575 (3d Cir.2006).

The parties agree that the terms and amount of Mr. Guinta's severance benefits were governed by Accenture's Separation Benefits Plan ("the Plan"). The Plan provided that an employee of Mr. Guinta's rank should receive 13 weeks pay and four months of COBRA payments in the event of termination due to position elimination. (Compl.Ex. C.) However, the Plan explicitly stated that "[a] Participant whose employment is terminated for Workforce Reduction or Position Elimination is eligible for Separation Benefits *only if* the Participant signs and submits to Accenture a Separation Agreement in the written form provided and approved by Accenture ... within the deadline specified in the Separation Agreement."(*Id.* (emphasis in original).) Section

Two of that Agreement, entitled "General Release of Claims," stated that Mr. Guinta released Accenture from "all claims of any nature whatsoever," including future claims for "salary, wages, bonuses and commissions ." (Def.'s Br. Supp. Mot. Dismiss, Ex. C.) Thus, Mr. Guinta's eligbility for severance was expressly conditioned on his consent not to seek any other form of payment.

Mr. Guinta concedes that he did not sign the Separation Agreement. (Pl.'s Br. Opp'n Mot. Dismiss 17.) Since the Plan expressly conditioned eligibility for the salary and COBRA payments which he seeks on his acquiescence to such an Agreement, Mr. Guinta's claim that he is entitled to those benefits is meritless. See Hoover, 465 F.3d at 575. Therefore, the court will grant summary judgment in favor of Accenture on Count Three of the Complaint. [2]

### C. Count Four: Accrued "Paid Time Off" Hours

*7 Count Four of the Complaint alleges that Accenture wrongfully denied PTO benefits to which Mr. Guinta was entitled as a result of his termination. Specifically, the Complaint alleges that Mr. Guinta had accrued 340 hours of PTO at the time of his termination, and that he was not paid for those hours. (Compl.¶¶ 44-46.) Accenture argues that Mr. Guinta was only entitled to 240 hours of PTO, and alleges that it already rendered payment for those hours. (Def.'s Br. Supp. Mot. Dismiss 10-11.); (Def.'s Reply Br. Supp. Summ. J. 15.)

In support of its claim that Mr. Guinta's PTO benefits must be limited to 240 hours, Accenture introduces two documents. The first, which is entitled "United States Policy: Paid Time Off," states that "unused PTO balances (up to 240 hours) will be paid out upon separation from the Company or prior to going on an approved unpaid leave of absence. Any unused accrued balance in excess of 240 hours will not be paid out, except where required by local law."(Def.'s Br. Supp. Mot. Dismiss, Ex. D.) The second document is a list of "Separation Package Frequently Asked Questions for Employees," which reiterates that "PTO will be paid out only up to 240 hours, except in states where law requires otherwise."(Def.'s Br. Supp. Mot. Dismiss, Ex. C.)

Mr. Guinta does not dispute the authenticity of those documents, but argues that he was unaware of the policy. That argument is unavailing. Mr. Guinta's claim for unused PTO hours does not arise out of any statute or case law, but rather out of Accenture's PTO policies themselves, which form an "employee welfare benefit plan" governed by ERISA.

**Guinta v. Accenture, LLP, Not Reported in F.Supp.2d (2008)**

2008 WL 4852934

*See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan" to include "any plan fund or program ... established or maintained by an employer ... for the purpose of providing its participants ... benefits in the event of sickness or ... vacation benefits.") Having asserted a claim for benefits pursuant to those policies, Mr. Guinta may not argue that his ignorance of their specifics justifies a circumvention of their terms. *See In re Lucent Death Benefits ERISA Litig.*, 541 F.3d 250, 254-55 (3d Cir.2008) (An employer's obligations under a benefit plan are governed by the "written documents and summary plan descriptions" relating to that plan, and such documents should be interpreted "as a matter of law without looking to extrinsic evidence" when their meaning is "clear and unambiguous."). Therefore, the claim for PTO will be reduced to 240 hours.

Accenture contends in its reply brief that the company paid Mr. Guinta 240 hours of PTO after he was terminated. (Def.'s Reply Br. Supp. Summ. J. 15.) In support of that claim, the company submits an "Electronic Earnings Statement" which indicates that Mr. Guinta was paid for 240 hours of PTO on April 7, 2008. (Def.'s Reply Br. Supp. Mot. Dismiss, Ex. A.) Mr. Guinta has not disputed the authenticity of that document, despite having ample opportunity to do so in either his subsequent filings or oral arguments. Therefore, the court will accept the Electronic Earnings Statement as proof that Mr. Guinta was paid the 240 hours of PTO to which he was entitled, and grant summary judgment in favor of Accenture on Count Four of the Complaint.

### D. Count Five: Equity Bonus for 2007

*8 Count Five of the Complaint alleges that Accenture wrongfully refused to pay Mr. Guinta's 2007 "long term incentive" bonus. The 2007 Compensation Model provided for such a bonus, to be paid "at the completion of the fiscal year in the form of equity" equivalent to Mr. Guinta's base pay of $230,000, if he reached his annual sales target of $40 million. (Compl., Ex. A.) Accenture concedes that Mr. Guinta met his sales target of $40 million for the 2007 fiscal year, but argues that the equity shares that made up the bonus were subject to a three-year vesting schedule contained in two documents which are not referenced or incorporated by the Compensation Model, the RSU Agreement and RSU Agreement Essential Grant Terms. (Def.'s Br. Supp. Mot. Dismiss 2.) Mr. Guinta did not sign either of those documents, and argues as a matter of law that he is not bound by their terms. (Pl.'s Br. Opp'n Mot. Dismiss 13-14.)

"[C]ontract construction-the determination of the legal relations of the parties to the contract-is a question of law." *Tracinda Corp. v. DaimlerChrysler AG*, 503 F.2d 212, 229 (3d. Cir.2007) (internal citations and quotations omitted). Therefore, a ruling interpreting the terms of a contract, or the issue of whether it binds a given party, forms an appropriate ground for summary judgment on claims arising out of that contract. See Anderson, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (summary judgment is appropriate "if, under the governing law, there can be but one reasonable conclusion as to the verdict.").

Contracts should be construed according to the plain and ordinary meaning of their terms. *See, e.g. Bergholm v. Peoria Life Ins. Co. .*, 284 U.S. 489, 492, 52 S.Ct. 230, 76 L.Ed. 416 (1932); *Imperial Life Ins. Co. v. Coos County*, 151 U.S. 452, 463, 14 S.Ct. 379, 38 L.Ed. 231 (1894); *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 364 (3d Cir.2004)."Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract."*Bohler-Uddeholm, Inc. v. Ellwood Group*, 247 F.3d 79, 93 (3d Cir.2001) (internal quotations and citations omitted). Thus, the court must give force to the intent of the parties by interpreting any agreement between Mr. Guinta and Accenture according to the plain usage of its terms. *See Gleason v. Nw. Mortgage, Inc.*, 243 F.3d 130, 138 (3d Cir.2001).

When determining the rights and duties granted by an agreement, "[i]t goes without saying that a contract cannot bind a nonparty."*E.E.O.C. v. Waffle House*, 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002); *Hay Group v. E.B.S. Acquisition Group*, 360 F.3d 404, 406 (3d Cir.2004) ("parties to a contract cannot bind nonparties."). Mr. Guinta agreed to the Compensation Model, but never signed the RSU Agreement or otherwise indicated that he agreed to be bound by its terms. Therefore, the vesting schedule contained in the RSU Agreement and the RSU Essential Grant Terms applied to Mr. Guinta's equity grant only if the plain meaning of the terms of the Compensation Model demonstrates that he agreed to that schedule.

*9 On examination of the Compensation Model, the court finds no evidence that the equity grant was subject to the vesting schedule contained in the RSU Agreement. Quite the opposite; the Compensation Model clearly states that "the award is to be paid at the completion of the fiscal year," and explicitly disavows the incorporation of terms from any other payment plan by declaring that "[t]his model supersedes any type of other variable pay program or equity program in which you may currently be participating."(Compl., Ex. A.)

**Guinta v. Accenture, LLP, Not Reported in F.Supp.2d (2008)**

2008 WL 4852934

The unambiguous language of the RSU Agreement lends further support to the conclusion that the vesting schedule and other terms contained therein did not apply to the Compensation Model. The RSU Agreement clearly states that awards granted under its auspices are "outside the terms of the Participant's contract of employment with the Constituent Companies and [are] therefore not to be considered part of any normal or expected compensation."(Def.'s Br. Supp. Mot. Dismiss, Ex. G.) Indeed, the terms of the RSU Agreement applied only to the 2008 fiscal year, and therefore could not possibly have been incorporated by the 2007 Compensation Model. *See(Id.)*

Based on the fact that Mr. Guinta was not a party to the RSU Agreement and the terms of that document were not incorporated by the 2007 Compensation Model, the court finds that the 2007 equity bonus was not subject to a vesting schedule and became due in full at the end of that fiscal year. As the drafter of the Compensation Model, Accenture could easily have incorporated a vesting schedule similar to the one contained in the RSU Agreement. *See Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (when interpreting the terms of a contract, "a court should construe ambiguous language against the interest of the party that drafted it."). Having failed to do so, it may not point to that schedule as justification for denying Mr. Guinta the equity bonus to which he was entitled under the Compensation Plan. Therefore, the court will deny Accenture's request for summary judgment on Count Five of the Complaint.

**E. Counts Six and Seven: Cash and Equity Bonuses for Fiscal Year 2008**

Counts Six and Seven of the Complaint contend that Accenture wrongfully refused to pay Mr. Guinta's "annual incentive" cash bonus and "long term incentive" equity bonus for the period between the end of the 2007 fiscal year and his termination on March 12, 2008. Those Counts assert, respectively, that (1) Accenture violated the covenant of good faith and fair dealing implied in the 2008 Compensation Plan, and (2) was unjustly enriched as a result of work performed by Mr. Guinta between the end of the 2007 fiscal year and his termination. In opposition to those allegations, Accenture sets forth a counter-argument to the equity bonus claim, but does not address the allegations that it wrongfully withheld the "annual incentive" cash bonus. Accenture contends that (1) the claims in Count Six and Seven arise out of the RSU Agreement, which states that New York law governs its

terms, and (2) under New York law, the facts alleged are not sufficient to state a claim for violation of the implied covenant of good faith and fair dealing or unjust enrichment.

**\*10** Having already decided with reference to Count Five that the terms of the RSU Agreement are not incorporated by the 2007 Compensation Model, the court holds that the nearly-identical terms of the 2008 Model render the RSU Agreement similarly irrelevant to the claims asserted in Counts Six and Seven. Furthermore, since the 2008 Compensation Plan includes specific provisions that govern the claims asserted in Counts Six and Seven, there is no need to delve into the intricacies of case law on claims for breach of the implied covenant of good faith and fair dealing or unjust enrichment. Summary judgment will be denied on the portion of Counts Six and Seven relating to the annual incentive cash bonus, but will be granted on the portions of those Counts relating to the long term incentive equity bonus.

*i. Annual Incentive-Cash Bonus*

The 2008 Compensation Model clearly states that "employees who are terminated by Accenture (other than 'for cause') before the end of the quarter in which an Annual Incentive award is earned are entitled to receive the award earned in that quarter."(Compl., Ex. B.) To be eligible for that bonus, Mr. Guinta was required to achieve a minimum of 75 percent of his yearly sales target of $40 million. (*Id.*) When pro rated over the four quarters of a fiscal year, Mr. Guinta's sales target was $10 million per quarter. Therefore, Mr. Guinta was entitled to an annual incentive cash bonus for the first quarter of 2008 if he achieved sales of at least $7.5 million. The Compensation Model provided that, after the threshold was reached, the amount of the annual incentive award should be calculated by multiplying the percentage of Mr. Guinta's sales target achieved by his salary, which was $57,500 per quarter. (Compl., Ex. B.)

Mr. Guinta alleges that "the business [he] had generated and/or was in the process of generating would have resulted in his achievement of his target sales by the end of the year 2008," but has not presented evidence relating to the specific percentage of his sales target achieved. *See* (Compl.¶ 60.) Without that information, the court is unable to calculate the proper annual incentive award. Therefore, summary judgment on the portion of Counts Six and Seven relating to the annual incentive cash bonus will be denied in order to allow the parties to undertake discovery and present evidence on the factual question of whether Mr. Guinta met his sales target between the end of 2007 and his termination.

**Guinta v. Accenture, LLP, Not Reported in F.Supp.2d (2008)**

2008 WL 4852934

### ii. Long Term Incentive-Equity Bonus

The 2008 Compensation Model states with respect to the long term equity bonus that "this award, if you qualify, will be granted following the completion of the fiscal year."(Compl., Ex. B.) By enumerating the specific time at which the bonus was to be granted, the 2008 Compensation Model precludes any earlier award and conditions eligibility on continued employment at the end of the fiscal year. Therefore, the court will grant summary judgment in favor of Accenture on the portion of Counts Six and Seven relating to the long term incentive equity bonus.

**\*11** The court's conclusion-that the terms of the 2008 Compensation Model prohibit payment of an equity bonus on the basis of work performed during a period shorter than the complete year-draws further support from an examination of the contract as a whole. Nothing in the Compensation Model provides for such payments, and a critical difference between the 2007 and 2008 versions of that document militates against such an interpretation. The 2007 Compensation Model provided that "employees who are terminated by Accenture (other than 'for cause') before the end of the quarter in which a bonus is earned are entitled to receive the bonus earned in that quarter."(Compl., Ex. A.) The 2008 Compensation Model replaced the broad term "bonus"-which would have applied to both the annual incentive cash award and the long term incentive equity grant-with the words "annual incentive award," thereby limiting bonus eligibility for employees terminated before the end of the fiscal year to cash awards. *See* (Compl., Ex. B.) An interpretation which allowed individuals, such as Mr. Guinta, terminated prior to

the end of the year to receive an equity bonus would negate that change and thus violate the parties' intent (as shown by the modification) to preclude such awards.

### III. CONCLUSION

For the reasons set forth above, Accenture's Motion for Summary Judgment is granted in part and denied in part. The court rules as follows:

1. Summary Judgment is granted on Count Three of the Complaint. Count Three is dismissed.

2. Summary Judgment is granted on Count Four of the Complaint. Count Four is dismissed.

3. Summary Judgment is denied on Count Five of the Complaint.

4. Summary Judgment is denied on the portion of Counts Six and Seven of the Complaint relating to the annual incentive cash bonus.

5. Summary Judgment is granted on the portion of Counts Six and Seven of the Complaint relating to the long term incentive equity bonus. Those portions of Counts Six and Seven are dismissed.

The court will enter an order implementing this opinion.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4852934

**Footnotes**

1   The "separation benefits" for an employee of Mr. Guinta's position and experience consist of 13 weeks salary and 4 months of COBRA payments. (Compl., Ex. C.)

2   The court would reach the same result even if Mr. Guinta had signed the Agreement, as his assertion of claims for PTO and bonuses would constitute a material breach of waiver contained in Section Two of that document. See (Def.'s Br. Supp. Mot. Dismiss, Ex. A.)

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "C"

Case 2:15-cv-05472-MCA-MAH   Document 16   Filed 09/08/15   Page 31 of 35 PageID: 186

Case 2:15-cv-03168-MCA-MAH   Document 26-2   Filed 07/06/15   Page 17 of 21 PageID: 207

Harvard Eye Associates v. Clinitec Intern., Inc., Not Reported in F.Supp. (1998)

1998 WL 248916

1998 WL 248916
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

HARVARD EYE ASSOCIATES,
v.
CLINITEC INTERNATIONAL, INC.

No. CIV.A. 98–302.   |   May 5, 1998.

### ORDER—MEMORANDUM

VANARTSDALEN.

*1  AND NOW, this 5th day of May, 1998, the motion to dismiss of defendant Clinitec International, Inc. is denied. Fed.R.Civ.P. 12(b)(1),[1] (3).

Defendant's motion presents two grounds for dismissal of this diversity action: (1) lack of subject matter jurisdiction —in that the limitation of liability clause in the parties' contract, compl., exh. a, ¶ 11, precludes plaintiff Harvard Eye Associates from meeting the $75,000 amount in controversy threshold of 28 U.S.C. § 1332(a); and (2) improper venue— in that the forum selection clause in the contract, compl., exh. a, ¶ 13(c), requires plaintiff to sue in the Montgomery County (Pa.) Court of Common Pleas. Defendant's motion, ¶¶ 2–5.

1. *Limitation of liability clause*—Defendant contends that under the contract plaintiff's damages are limited to restitution of the amounts paid defendant—$59,145.15—and recoveries for incidental or consequential damages (Count I) or damages for fraudulent or negligent misrepresentation (Count III) are impermissible. Limitation of liability clauses are enforceable under Pennsylvania law, "especially when contained in contracts between informed business entities dealing at arms length, and there has been no injury to person or property."*Valhal Corp. v. Sullivan Associates, Inc.,* 44 F.3d 195, 203–04 (3d Cir.1995). The limitation does not apply, however, to claims for intentional torts. *See id.* at 203 ("[T]he limitation ... is not enforceable if the damage is caused by willful or wanton conduct.... The weight of authority supports interpreting [liability limitation clauses] to extend only to acts of ordinary negligence and exclude conduct found to be willful, malicious or reckless.") (citation omitted). Count III of the complaint includes a claim for fraudulent misrepresentation. Inasmuch as damages are alleged to have been caused by defendant's intentional conduct, the limitation of liability clause does not prevent inclusion of such amounts to satisfy § 1332(a). Dismissal under Rule 12(b)(1) is, therefore, unwarranted.[2]

2. *Forum selection clause*—"Any cause or action arising out of or relating to this Agreement may only be brought in the courts of applicable jurisdiction in the Commonwealth of Pennsylvania, Montgomery County and the parties hereby submit to the jurisdiction and venue of such courts."Compl., exh. a, at ¶ 11(c). According to defendant, this clause confines the filing of an action to the Montgomery County Court of Common Pleas. Defendant's motion, ¶ 5.

The clause refers, in the plural, to "courts of applicable jurisdiction." This court, albeit federal, is a court that has "applicable jurisdiction" in Montgomery County—being one of the 10 Pennsylvania counties that make up its jurisdictional designation. *See*28 U.S.C. § 116(a) (1994). In contrast, the forum selection clauses in cases cited by defendant are much more precisely and narrowly drafted than the one at issue here. *See, e.g., Excell, Inc. v. Sterling Boiler & Mechanical, Inc.,* 106 F.3d 318, 320 (10th Cir.1997) ("venue shall lie in the County of El Paso, Colorado"); *Milk 'N' More, Inc. v. Beavert,* 963 F.2d 1342, 1343 (10th Cir.1992) ("venue shall be proper under this agreement in Johnson County, Kansas"); *Cedarbrook Associates v. Equitec Savings Bank,* 678 F.Supp. 107, 107–08 (E.D.Pa.1987) ("any State Court within Alameda County, State of California"). Here, to the extent that any ambiguity lurks in the forum selection clause, it should be construed against the drafter—in this instance, defendant, complaint, exh. a, at 1 ("Software License and Services Agreement"); plaintiff's response, at 8. *Rusiski v. Pribonic,* 511 Pa. 383, 390, 515 A.2d 507, 510 (1986) (construing ambiguity in contract against drafter); *Milk 'N' More,* 963 F.2d at 1346 (same).

**All Citations**

Not Reported in F.Supp., 1998 WL 248916

---

Footnotes

1    A dismissal may be ordered under Rule 12(b)(1) for failure to satisfy the jurisdictional amount requirement only if it appears to a legal certainty that the complaint is claiming less than $75,000. *See Suber v. Chrysler Corp.,* 104 F.3d 578, 583 (3d

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.                    1

**Harvard Eye Associates v. Clinitec Intern., Inc., Not Reported in F.Supp. (1998)**

1998 WL 248916

Cir.1997). This initial inquiry "should involve the court in only minimal scrutiny of the plaintiff's claims. The court should not consider ... the legal sufficiency of those claims or whether the legal theory advanced by the plaintiffs is probably unsound.... [T]he threshold to withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion."*Id.* (internal quotations and citation omitted).

2      In support of its liability limitation argument, defendant also invokes the economic loss doctrine, *see* reply, at 11–12, which "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract,"*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir.1995). Analysis of plaintiff's contract and tort claims under this doctrine, however, would require more than the "minimal scrutiny" of claim sufficiency appropriate under Rule 12(b)(1).*Suber,* 104 F.3d at 583.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "D"

**Stateline Power Corp. v. Kremer, 148 Fed.Appx. 770 (2005)**

148 Fed.Appx. 770
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Eleventh Circuit Rules 36-2, 36-3. (Find
CTA11 Rule 36-2 and Find CTA11 Rule 36-3)
United States Court of Appeals,
Eleventh Circuit.

STATELINE POWER CORP., f.k.a. Southeast
Diesel Acquisition Sub, Inc., Plaintiff-Appellee,

v.

Richard KREMER, Defendant-Appellant.

No. 05-10269.    |    D.C. Docket No.
04-21927-CV-JLK.    |    June 23, 2005.

**Synopsis**
**Background:** Breach of contract action was brought in
state court against non-resident defendant, who removed suit
to federal court. The United States District Court for the
Southern District of Florida remanded to state court, and
defendant appealed.

**[Holding:]** The Court of Appeals held that ambiguous forum
selection clause would be construed against plaintiff-drafter.

Vacated and remanded.

West Headnotes (2)

**[1]    Contracts**
    ⟜ Legal Remedies and Proceedings

Ambiguous forum selection clause in contract,
granting jurisdiction to "the courts of the State of
Florida," would be construed, against drafter, as
including both federal and state courts in Florida.

16 Cases that cite this headnote

**[2]    Contracts**

    ⟜ Legal Remedies and Proceedings
**Removal of Cases**
    ⟜ Waiver of Right

Contractual forum selection clause, under which
parties "consented" to jurisdiction of state courts,
was permissive, and thus did not constitute
waiver of nonresident defendant's right to
remove case to federal court.

16 Cases that cite this headnote

**Attorneys and Law Firms**

*771 Jack R. Reiter, Adorno & Yoss, P.A., Miami, FL, for
Plaintiff-Appellee.

Paul Aiello, Michael Paul Bennett, Bennett Aiello Henry &
McGuinness, LLP, Miami, FL, for Defendant-Appellant.

Appeal from the United States District Court for the Southern
District of Florida.

Before TJOFLAT, HULL and WILSON, Circuit Judges.

**Non-Argument Calendar**

PER CURIAM.

The district court remanded this diversity case to state court
based on the forum selection clause of the parties' contract,
which states:

> 18. *Governing Law.* This Agreement
> and the rights and obligations
> hereunder shall be governed by the
> laws of the State of Florida and the
> parties to this Agreement specifically
> consent to the jurisdiction of the courts
> of the State of Florida over any
> action arising out of or relating to this
> Agreement.

The non-resident defendant appeals,[1] contending that the
remand order misconstrues and therefore misapplies the
forum selection clause. We agree.

[1]    Contrary to the district court's view, the phrase "the
courts of the State of Florida" is ambiguous, potentially

Stateline Power Corp. v. Kremer, 148 Fed.Appx. 770 (2005)

including not only state courts but federal courts as well. Plaintiff drafted the agreement; hence, the ambiguity must be resolved in favor of the defendant, *Global Satellite Communication Co. V. Starmill U.K. Ltd.,* 378 F.3d 1269, 1274 (11th Cir.2004), so that the phrase includes federal courts, as well as state courts, in Florida.

[2]    Alternatively, if the phrase is unambiguous and refers only to Florida's state courts, we must consider an issue the district court failed to address: whether paragraph 18 is a "permissive" or a "mandatory" forum selection clause. *Id.* at 1272. The paragraph contains no mandatory language to indicate that the parties meant to foreclose litigation anywhere

else. Moreover, nothing in the paragraph's language suggests that the defendant waived his right to remove the case to *772 federal court. In short, paragraph 18 is permissive.

The district court's remand order is vacated. The case is returned to the district court for further proceedings.

SO ORDERED.

**All Citations**

148 Fed.Appx. 770, 2005 WL 1489193

Footnotes

1      We have jurisdiction to review the remand order. *Snapper, Inc. V. Redan,* 171 F.3d 1249, 1260 (11th Cir.1999) (28 U.S.C. § 1447(d) does not bar review of remand order based on a forum selection clause.).

End of Document                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.    2